**GRANT & EISENHOFER P.A.**
Olav A. Haazen (OH7788)
Alice Y. Cho (AC0728)
485 Lexington Ave., 29th Floor
New York, NY 10017
Tel: (646) 722-8500
ohaazen@gelaw.com
acho@gelaw.com

*Attorneys for the Applicants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re *Ex Parte* Application of CI INVESTMENTS INC., ACTING IN ITS CAPACITY AS MANAGER AND TRUSTEE FOR AND ON BEHALF OF FIRST ASSET MORNINGSTAR INTERNATIONAL VALUE INDEX ETF; LIGHTHOUSE INVESTMENT PARTNERS LLC; and STICHTING BEDRIJFSTAKPENSIOENFONDS VOOR DE MEDIA PNO for an order pursuant to 28 U.S.C. § 1782 | Misc. Action No.: 24-mc-426<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION FOR ORDER PURSUANT TO 28 U.S.C. § 1782** |

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

I.      PRELIMINARY STATEMENT ................................................................... 1

II.     FACTUAL BACKGROUND ....................................................................... 4

    A.      RELEVANT PARTIES .................................................................. 4

    B.      INVESTIGATIONS AND PROCEEDINGS AGAINST DANSKE IN
        CONNECTION WITH DANSKE'S MONEY LAUNDERING ACTIVITIES .......................... 5

    C.      PROMONTORY'S INVESTIGATION INTO DANSKE'S NON-RESIDENT
        PORTFOLIO AND MONEY LAUNDERING ACTIVITIES ................................. 7

    D.      THE NATURE OF THE FOREIGN PROCEEDINGS ....................................... 10

III.    ARGUMENT ......................................................................................... 13

    A.      APPLICABLE STANDARDS .......................................................... 13

    B.      THE APPLICATION MEETS ALL STATUTORY REQUIREMENTS ................................. 15

    C.      THE DISCRETIONARY FACTORS WEIGH HEAVILY IN FAVOR OF
        GRANTING THE APPLICATION .................................................... 16

        1.      Granting Discovery Promotes the Twin Aims of Section 1782 ............... 16

        2.      The Evidence Sought from Promontory Is Beyond the Danish
            Courts' Jurisdictional Reach .................................................... 19

        3.      The Applicants Seek Information Essential to Foreign Proceedings
            and Nothing Indicates the Foreign Tribunal Would Not Be
            Receptive to the U.S. Court's Assistance ....................................... 20

        4.      This Application Does Not Circumvent Danish Proof-Gathering
            Restrictions or Other Policies .................................................. 22

        5.      The Discovery Sought Is Narrowly Tailored to the Needs of
            the Danish Actions, and Is Neither Burdensome Nor Unduly
            Intrusive ................................................................... 24

    D.      THE DISCOVERY SOUGHT BY APPLICANTS IS NOT PRIVILEGED ......................... 26

        1.      The Materials Sought Would Have Been Prepared Irrespective
            of Litigation ................................................................. 26

2.    The Work Product Doctrine Does Not Apply to Underlying
Factual Information ..................................................................................... 29

IV.    CONCLUSION ........................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Accent Delight Int'l Ltd.*,
    869 F.3d 121 (2d Cir. 2017)..................................................................................16

*Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*,
    No.18-CV-10364-LGS-SDA, 2022 WL 2168916 (S.D.N.Y. June 16, 2022) ........................17

*Allied Irish Banks v. Bank of Am., N.A.*,
    240 F.R.D. 96 (S.D.N.Y. 2007) ..........................................................................27

*In re Ambercroft Trading Ltd.*,
    No. 18-MC-80074-KAW, 2018 WL 286744 (N.D. Cal. June 11, 2018) ..............................14

*In re Ex Parte Application of CI Investments Inc.*,
    No. 23-mc-00434-GHW-GS (S.D.N.Y. Dec. 14, 2023).....................................................13

*In re Atvos Agroindus. Inv. S.A.*,
    481 F. Supp. 3d 166 (S.D.N.Y. 2020).....................................................................19

*In re Banco Santander (Brasil) S.A.*,
    No. 22-MC-00022 (ALC), 2022 WL 1546663 (S.D.N.Y. Apr. 6, 2022) ..............................21

*In re Bloomfield Inv. Res. Corp.*,
    315 F.R.D. 165 (S.D.N.Y. 2016) ..........................................................................23

*In re BNP Paribas Jersey Tr. Corp.*,
    No. 18-MC-00047, 2018 WL 895675 (S.D.N.Y. Feb. 14, 2018)........................................23

*Cal. State Tchrs. Ret. Sys. v. Novo Nordisk, Inc.*,
    No. CV1916458FLWDEA, 2020 WL 6336199 (D.N.J. Oct. 29, 2020) ..............................21

*CFE Int'l LLC v Denham Cap. Mgmt. LP*,
    No. 22-MC-91355-FDS, 2022 WL 19558086 (D. Mass. Oct. 17, 2022) ..............................14

*Dohrn v. IKB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012) ...............……………………………….…………………………13

*In re Douglas Frederick*,
    No. 20-MC-965-RP, 2020 WL 13190169 (W.D. Tex. Oct. 2, 2020)....................................14

*Euromepa S.A. v. R. Esmerian Inc.*,
    51 F.3d 1095 (2d Cir. 1995)..................................................................................4, 16, 21

*Foden v. Gianoli Aldunate,*
    3 F.3d 54 (2d Cir. 1993)................................................................................22

*Forsta AP-Fonden v. St. Jude Medical, Inc.,*
    No.12-CV-3070 (JNE/HB), 2015 WL 13687909 (D. Minn. June 24, 2015) ........................17

*In re Gorsoan Ltd.,*
    No. 13 Misc. 397 (PGG), 2014 WL 7232262 (S.D.N.Y. Dec. 10, 2014)..............................23

*Gorsoan Ltd. v. Bullock,*
    652 F. App'x 7 (2d Cir. 2016)..........................................................................19

*In re Guo,*
    965 F.3d 96 (2d Cir. 2020)..............................................................................14

*Gushlak v. Gushlak,*
    486 F. App'x 215 (2d Cir. 2012) .......................................................................13

*Haarslev Indus., A/S v. Hans-Henrik Nissen,*
    No. 18-09009-MC-W-ODS, slip. op. (W.D. Mo. May 22, 2018) ...........................21

*Intel Corp. v. Advanced Micro Devices, Inc.,*
    542 U.S. 241 (2004)................................................................................ *passim*

*In re Kidder Peabody Secs. Litig.,*
    168 F.R.D. 459 (S.D.N.Y. 1996) ..............................................................28, 29

*Kiobel v. Cravath, Swaine & Moore LLP,*
    895 F.3d 238 (2d Cir. 2018)............................................................................14

*La Suisse, Societe d'Assurances Sur La Vie v. Kraus,*
    62 F. Supp. 3d 358 (S.D.N.Y. 2014)..................................................................19

*In re Ltr. of Req. for Int'l Jud. Assist. from the Dist. Ct. of Lyngby, Denmark,*
    No. 13 CV00919 919 (N.D. Ill. Feb. 5, 2013) .....................................................21

*Marubeni Am. Corp. v. LBA Y.K.,*
    335 F. App'x 95 (2d Cir. 2009) .......................................................................16

*Mees v. Buiter,*
    793 F.3d 291 (2d Cir. 2015)...................................................................... *passim*

*In re Metallgesellschaft,*
    121 F.3d 77 (2d Cir. 1997)..............................................................................23

*Minatec Fin. S.A.R.L. v. SI Grp. Inc.,*
    No. 8-CV-269, 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) ..............................22

*Mitzner v. Sobol*,
  136 F.R.D. 359 (S.D.N.Y. 1991) ................................................................29

*In re OOO Promnefstroy*,
  No. M 19-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) .........................20

*In re Operacion y Supervision de Hoteles*,
  No. 14 Misc. 82 (PGG), 2015 WL 82007 (S.D.N.Y. Jan. 6, 2015)..........................19

*Oppenheimer Fund, Inc. v. Sanders*,
  437 U.S. 340 (1978) .............................................................................25

*Optimal Invs. Servs. S.A. v. Berlamont*,
  773 F.3d 456 (2d Cir. 2014).....................................................................14

*In re Patokh Chodiev & Int'l Min. Res. B.V.*,
  No. 18-MC-13 (EGS), 2021 WL 3270042 (D.D.C. Feb. 15, 2022) .......................14

*In re Req. for Int'l Jud. Assist. from the Dist. Ct. of Kolding, Denmark – Matter of Mette
  Lohse Skou Jensen v. Dwight Ferguson*,
  No. DK-7000, No. 15-MC-73 (W.D.N.C. May 4, 2015).......................................21

*In re Schottdorf*,
  No. 8-CV-269, 2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006) ..........................22, 24

*In re Servicio Pan Americano*,
  354 F. Supp. 2d 269 (S.D.N.Y. 2004)..........................................................23

*In re Shervin Pishevar*,
  439 F. Supp. 3d 290 (S.D.N.Y. 2020)......................................................21, 23

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
  No. 01-CV-9291 (JSM), 2002 WL 1998195 (S.D.N.Y. Aug. 29, 2002)....................30

*In re Sveaas*,
  249 F.R.D. 96 (S.D.N.Y. 2008) .............................................................19, 25

*United States v. Adlman*,
  134 F.3d 1194 (2d Cir. 1998)................................................................26, 27

*In re Top Matrix Holdings Ltd.*,
  No. 18 Misc. 465 (ER), 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ......................20

*Xie v. Lai*,
  No. 19-MC-80287-SVK, 2019 WL 7020340 (N.D. Cal. Dec. 20, 2019)..................14

*In re YS GM Marfin II LLC,*
   No. 20 MISC. 182 (PGG), 2022 WL 624291 (S.D.N.Y. Mar. 2, 2022)..................................22

**Statutes and Rules**

28 U.S.C. § 1782.................................................................................................. *passim*

28 U.S.C. § 1782(a) .........................................................................................3, 19

Federal Rule 26(b) ................................................................................................25

Federal Rules of Civil Procedure Rules 26, 30, and 45 ....................................30

The Applicants CI Investments Inc., acting in its capacity as manager and trustee for and on behalf of First Asset Morningstar International Value Index ETF; Lighthouse Investment Partners LLC; and Stichting Bedrijfstakpensioenfonds voor de Media PNO (the "Applicants") respectfully submit this Memorandum of Law in support of their *ex parte* application pursuant to 28 U.S.C. § 1782 ("Application") for an order granting leave to issue subpoenas for deposition testimony and production of documents by Promontory Financial Group LLC ("Promontory") for use in a foreign proceeding.

## I.    PRELIMINARY STATEMENT

The Application seeks discovery from Promontory for use in litigation (the "Danish Actions") against Danske Bank A/S ("Danske") in Copenhagen City Court and the Eastern High Court in Denmark (the "Danish courts"). The Danish Actions are based on a series of money laundering activities over a nine-year period from 2007 through 2015 by Danske's Estonian branch ("Danske Estonia"), which has been referred to as the largest money laundering scandal in world history, involving an astounding $234 billion worth of suspicious transactions. Promontory was commissioned by Danske to investigate the aforementioned money laundering activities by collecting and analyzing documents, emails and other Danske materials in order to produce draft questions for witness interviews, participate in interviews, and produce a fact-finding report.

The deposition testimony and documents the Applicants seek to obtain for use in the Danish Actions relate to all aspects of the Danish Actions and are critical in helping the Applicants prove their case. Specifically, the Applicants believe that Promontory's report based on those documents addresses who at Danske knew what and when, with specific references to the Audit Committee, Executive Board, Board of Directors, CEO Thomas Borgen, and other high-level executives, board and executive meetings, internal memos and email communications, etc. These underlying factual documents are believed to be highly probative of Danske's wrongdoing and

liability in violation of Danish securities laws and there is no other way than via this Section 1782 proceeding for the Applicants to obtain such evidence from Promontory.

The Applicants' deposition testimony topics and document requests are listed in the Schedules A to Subpoenas attached as **Exhibits I** and **J** ("Subpoenas") to the Declaration of Alice Y. Cho, Esq., dated September 6, 2024 ("Cho Decl."), submitted herewith.  The document requests seek two categories of documents related to: (i) draft and final investigative reports prepared by Promontory on behalf of Danske concerning or related to Danske Estonia's non-resident customer accounts, actual or potential instances of money laundering through Danske Estonia, Danske Estonia's anti-money laundering, Know-Your-Customer and transaction monitoring practices, or Danske's knowledge or supervision of such practices, including all footnotes, end notes, exhibits, annexes, and attachments to such reports, but excluding any suspicious activity reports ("SARs") that Promontory may have reviewed or any references that identify specific persons or entities as subject to SARs (**Request #1**); and (ii) materials containing underlying factual information used in generating any draft and final investigative report concerning or related to Danske Estonia's non-resident customer accounts, actual or potential instances of money laundering through Danske Estonia, Danske Estonia's anti-money laundering, Know-Your-Customer and transaction monitoring practices, or Danske's knowledge or supervision of such practices, to the extent such materials are cited in the footnotes and/or end notes to such reports, but excluding any SARs that Promontory may have reviewed or any references that identify specific persons or entities as subject to SARs (**Request #2** together with Request #1, the "Requests").  To the extent referred to in public documents, court submissions, and/or other discovery materials, the Applicants have specified examples of such documents of which they are aware.

Danish courts have no authority to compel Promontory, a U.S.-based consulting firm, to produce documents relevant to the Danish Actions.  Given the limitations on discovery in Denmark, without access to the discovery requested here the Applicants have no means of obtaining the same probative evidence and, therefore, justice could be denied for the Applicants. Promontory has possession, custody, or control of the requested materials, but lies beyond the jurisdictional reach and subpoena powers of the Danish courts.  The Applicants therefore properly invoke 28 U.S.C. § 1782 to obtain discovery from Promontory in the form of deposition testimony and production of documents.

Pursuant to Section 1782, "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person."  28 U.S.C. § 1782(a).  The Application satisfies each of Section 1782's three statutory prerequisites:  (i) Promontory resides in this judicial district; (ii) the Danish Actions constitute a "proceeding in a foreign . . . tribunal"; and (iii) the Applicants are claimants in the Danish Actions, and thus each an "interested person" entitled to seek assistance from this Court. *Id*.

The Applicants also satisfy the discretionary factors outlined by the U.S. Supreme Court in *Intel Corporation v. Advanced Micro Devices, Inc*., 542 U.S. 241 (2004), because, as attested to in the Declaration of Lotte Noer, Esq., dated September 6, 2024 ("Noer Decl."), submitted herewith, (1) Promontory is not a named or contemplated party in the Danish Actions, and the Danish courts have no jurisdiction over it ; (2) Danish courts have traditionally been receptive to assistance from U.S. courts in adjudicating disputes, and they will be receptive to evidence obtained here through Section 1782 discovery; (3) the Application does not conceal an attempt to

3

circumvent foreign proof-gathering restrictions but instead is a good-faith effort to obtain highly probative and critical information to the Danish Actions that the Applicants can only obtain via the requested Section 1782 order; and (4) the discovery sought is not unduly intrusive or burdensome. *See Intel,* 542 U.S. at 264-65.

Additionally, granting the Application will promote the twin aims of the Section 1782 statute: "promoting efficiency in international litigation and persuading other nations, by example, to do the same." *Euromepa S.A. v. R. Esmerian Inc.,* 51 F.3d 1095, 1102 (2d Cir. 1995).

For these reasons, the Applicants respectfully request that the Court grant the Application.

## II.    FACTUAL BACKGROUND

### A.    RELEVANT PARTIES

Applicant CI Investments Inc., acting in its capacity as manager and trustee for and on behalf of First Asset Morningstar International Value Index ETF, is a trustee of a trust established in Ontario, Canada.  Noer Decl. ¶ 9.

Applicant Lighthouse Investment Partners LLC is a limited liability company incorporated in the United States. *Id.*

Applicant Stichting Bedrijfstakpensioenfonds voor de Media PNO is a pension fund foundation incorporated in the Netherlands. *Id.*

The Applicants are investors in Danske securities listed primarily on the NASDAQ Copenhagen stock exchange. *Id.*  The Applicants suffered significant losses when between February and October 2018 the truth about Danske's money laundering fraud came out. *Id.*

Promontory Financial Group LLC is a global consulting firm with a corporate office at 280 Park Ave., #11F, New York, NY 10017.  Cho Decl. ¶ 3.

Non-party Danske Bank A/S is a financial institution organized and licensed under the laws of Denmark and residing at Holmens Kanal 2-12, DK-1092, Copenhagen, Denmark.  Non-party

Danske Estonia is a branch of Danske, located at Narva mnt 11, 15015, Tallinn, Estonia.  Cho Decl. ¶ 4.

## B.    INVESTIGATIONS AND PROCEEDINGS AGAINST DANSKE IN CONNECTION WITH DANSKE'S MONEY LAUNDERING ACTIVITIES

Danske Estonia was the key player in one of the largest money laundering scandals in history.  Noer Decl. ¶ 4.  For a nine-year period, from 2007 through 2015, an astronomical $234 billion in suspicious transactions flowed through the bank as part of the money laundering scheme. *Id*.  It was later revealed that Danske's central management had known about its money laundering activities for some time but attempted to cover them up.  *Id.* ¶ 5.  Once the fraud was publicly disclosed, Danske's stock lost over $12.8 billion in value and its CEO Thomas Borgen resigned. *Id*. ¶ 6.

On March 14, 2019, the Applicants' Danish counsel filed a large number of claims against Danske in the City Court of Copenhagen, representing 168 institutional investors who collectively suffered approximately $470 million in stock market losses as a result of the series of revelations of Danske's money laundering fraud.  *Id*. ¶ 8.  Between October 2019 and February 2021, additional institutional investors represented by the Applicants' Danish counsel filed further claims, which brought the total claim value in the Danish Actions to around $1 billion in losses suffered by over 300 claimants (including the Applicants).  *Id*.  The claimants, including the Applicants, allege that Danske's central management had knowledge of its branch's money laundering activities for years but took nearly two years to mitigate it and engaged in a years-long cover-up to keep the truth from financial regulators in Estonia and Denmark, and from its investors. Noer Decl.  ¶ 10.

On December 12, 2022, Danske entered into a plea agreement with the U.S. Department of Justice ("DOJ"), agreeing to pay fines of over $2 billion (Cho Decl. **Ex. A** (Plea Agreement) at

18) as part of an integrated, global resolution with the U.S. Securities and Exchange Commission ("SEC"), the U.S. Attorney's Office for the Southern District of New York, and Denmark's Special Crime Unit, and implementing a compliance program and AML controls. Cho Decl. **Ex. B** (SEC Press Release) at 2. The Plea Agreement provided for fines payable to the DOJ in the amount of $1.209 billion, $178.6 million to the SEC, and $672,316,404 to the Danish Special Crime Unit, for a combined total of around $2.06 billion. *Id*. & Noer Decl. **Ex. 1** (Danske Bank Press Release) at 1-2.

On December 13, 2022, the SEC announced fraud charges against Danske for misleading investors about its anti-money laundering compliance program in its Estonian branch and failing to disclose the risks posed by the program's significant deficiencies. Cho Decl. **Ex. D** (SEC Cmplt.) ¶ 1. The SEC Complaint alleged that "[f]rom at least 2009 to and including 2016, Danske, directly and through its branch in Estonia . . ., provided banking services to suspicious customers despite knowing there was a high degree of risk that such customers were potentially engaged in money laundering." *Id*. According to the SEC, Danske "knew or was reckless in not knowing of numerous red flags indicating that its employees and managers at Danske Estonia had, amongst other things, conspired with customers to circumvent the anti-money laundering ('AML') laws and regulations of the European Union, Denmark, and Estonia, and that Danske's internal AML and 'know your customer' ('KYC') safeguards were weak and ineffective." *Id.*

The SEC Complaint also alleged that, while Danske knew of these high-risk transactions, it "knowingly or recklessly made materially misleading statements and omissions in its publicly available reports . . . stating that Danske was compliant with its legal obligations to prevent its services from being used for illicit purposes – including money laundering – and that it had effectively managed these risks." *Id*. Further, Danske stopped providing services to its high-risk

customers by April 2016 but failed to timely disclose to investors known misconduct and widespread AML failures.  *Id.*  When between September 2017 and November 2018 the full extent and nature of Danske's illegal activity became publicly known, Danske's share price dropped by almost 50%.  *Id.*

### C.  PROMONTORY'S INVESTIGATION INTO DANSKE'S NON-RESIDENT PORTFOLIO AND MONEY LAUNDERING ACTIVITIES

On April 20, 2017, following significant media coverage on the "Russian Laundromat," Danske commissioned Promontory to conduct a "root-cause analysis" of issues related to Danske's Non-Resident Portfolio in its Estonian branch (Cho Decl. **Ex. F** (First Promontory Fact-Finding Investigation)).[1]   In a letter written by Danske to the Danish Financial Supervisory Authority ("Danish FSA") on October 16, 2017, the Company stated:

> Based on leaked data and consequent media attention in the beginning of 2017, the Bank became aware of the extent of alleged money laundering activities that have potentially taken place in the terminated Non-Resident Portfolio. Against this background, the Bank instructed law firm, Kromann Reumert, and, in turn, the regulatory consulting firm, Promontory Financial Group ("Promontory") on 20 April 2017 to conduct a "Root-cause Analysis" to help explore what went wrong and to identify the deficiencies which may have enabled the Group [Danske] to potentially having been used by criminals for money laundering and other illegal purposes in the Estonian Branch.

Cho Decl. **Ex. E** (10/16/17 Ltr.), at 1.  In a Danske Executive Board meeting on June 20, 2017, Anders Jorgensen, former head of Group Compliance, "explained that the main focus of the root cause analysis was to ensure that learnings were properly recorded to prevent future incidents." Cho Decl. **Ex G** (06/20/2017 ExBo Meeting), at 7.

---

[1]   *See* Danske's Portfolio Investigation, Report, https://danskebank.com/-/media/danske-bank-com/file-cloud/2018/9/report-on-the-non-resident-portfolio-at-danske-banks-estonian-branch.pdf, at 75 (last visited on Sep. 13, 2024); *see also infra* at II.C.

The results of the First Promontory Fact-Finding Investigation were presented by Promontory to Danske executives in June of 2017.[2]  According to the presentation, Promontory uncovered that Danske's headquarters (referred to as "Group") "was unable to deter and detect money laundering through the Portfolio due to insufficient investigation, oversight, and integration of the Estonian branch."  Cho Decl. **Ex. F** (Root-Cause Analysis), at 7.

> Lack of investigation: For several years before the August 2014 Russian Laundromat articles, and following these articles, Group [Danske] missed several opportunities to assess the full scope of illicit activities occurring at the Estonian branch, and consequently postponed remediation.
>
> Lack of oversight: Group [Danske] had limited line of sight into Estonian operations and relied on local management to oversee operations and conform to Group norms.
>
> Lack of integration: "Legacy" reporting lines and systems allowed the Estonian branch to operate independently from Group [Danske].

*Id.*

Promontory's findings prompted Danske to direct further investigation into Danske Estonia's Non-Resident Portfolio, and Danske's years-long money laundering.  This was confirmed on September 7, 2017, when Flemming Pristed, head of Danske's legal department publicly stated that "[o]n the basis of the suspicion of possible money laundering or other illegal activities, we have decided to take another look at the situation in Estonia during the period leading up to 2014," and that "various investigations" had already been initiated "to establish what exactly took place during that period and to learn from what happened then."[3]

---

[2]    Danske's    Portfolio    Investigation,    Report,    https://danskebank.com/-/media/danske-bank-com/file-cloud/2018/9/report-on-the-non-resident-portfolio-at-danske-banks-estonian-branch.pdf, at 75 (last visited Sep. 13, 2024).

[3]    https://www.wealthbriefing.com/html/article.php/%27Azerbaijani-Laundromat%27-implicates-PEPs"'Azerbaijani Laundromat' Implicates PEPs", Wealth Briefing, https://www.wealthbriefing.com/html/article.php/%27Azerbaijani-Laundromat%27-implicates-PEPs (last visited Sep. 13, 2024).

On September 21, 2017, Danske published a press release summarizing the results of the First Promontory Fact-Finding Investigation and informing the public that "[t]he expanded investigation has already begun and is conducted by the newly established Compliance Incident Team" and that "[a]s the investigation is comprehensive, Danske Bank expects to complete it in the course of 9 to 12 months."[4]

In the October 16, 2017 letter written by Danske to the Danish FSA, Danske stated that the purpose of the expanded investigation was "to investigate – *beyond what has already been investigated in connection with the leaks* – and obtain a full 'insight' as to any potential suspicious customers and transactions. The Bank will then report relevant information to the authorities where necessary and use this insight to prevent similar situations in the future." Cho Decl. **Ex. E** (10/16/17 Ltr.), at 2 (emphasis original). Consistent with this dual purpose, the expanded investigation had two components: a "Portfolio Investigation" and an "Accountability Investigation."[5] The stated reasons of the Accountability Investigation report were to "form a basis for decision-making in Danske Bank's Board of Directors" and to assess Danske Bank's "potential institutional and individual accountability arising out of actions and omissions by individuals within Danske Bank who may have failed to identify, escalate or halt suspicious activities related to the Non-Resident Portfolio in Danske Bank's Estonian branch." *Id.* at 19.

The Portfolio Investigation was commenced, and its results were made public,[6] at substantially the same time as the Accountability Investigation report, and it also served to identify

---

[4] Cho Decl. **Ex. H** (9/21/2017 Press Release), https://danskebank.com/news-and-insights/news-archive/press-releases/2017/pr21092017 (last visited Sep. 13, 2024).

[5] Danske's Portfolio Investigation Report, https://danskebank.com/-/media/danske-bank-com/file-cloud/2018/9/report-on-the-non-resident-portfolio-at-danske-banks-estonian-branch.pdf, at 4 (last visited Sept. 13, 2024).

[6] *Id.*

the individuals involved. *Id*. at 15. Besides its main focus on "customers in the Non-Resident Portfolio and their payments and trading activities during this period," the "employees and agents of the Estonian branch who handled the Non-Resident Portfolio or could otherwise have been involved [we]re also investigated to uncover potential internal collusion." *Id*

With the Portfolio Investigation formally mandated by Danske Bank's Board of Director in December 2017, Danske engaged Danish law firm Bruun & Hjejle as counsel to "oversee[], supervise[] and direct[]" the expanded investigation "to ensure that the investigation [was] objective and thorough." *Id.* In connection with the Accountability Investigation part of the expanded investigation, Bruun & Hjejle charged Promontory with investigating the facts behind the suspect Non-Resident Portfolio (the "Second Promontory Fact-Finding Investigation"), which included "conduct[ing] interviews with employees, including members of the Executive Board, and members of the Board of Directors, both current and former." Cho Decl. **Ex. E** at 20. Almost 50 individuals were interviewed, and a total of 74 interviews were conducted as part of the investigation. *Id.* In conducting its fact-finding mission, Promontory was also "given access to over 40 email accounts, in total containing more than eight million emails, documents, calendar invites etc." *Id.*

The reports of the First and Second Promontory Fact-Finding Investigations and the draft and final versions of those reports and the underlying factual information collected and used in the reports are highly probative and critical information to the Danish Actions that the Applicants can only obtain via the requested Section 1782 order.

### D. THE NATURE OF THE FOREIGN PROCEEDINGS

In the Danish Actions, the Applicants seek compensation for losses caused by Danske's violations of its disclosure obligations pursuant to, *inter alia*, the Danish Securities Trading Act and the European Union's Market Abuse Regulation to inform the market in a timely manner about

the extensive money laundering activities in Danske Estonia, as well as its failure to implement and enforce necessary procedures to prevent money laundering.  Noer Decl. ¶ 13.

The Danish Actions consist of over 300 cases filed in the Copenhagen City Court in Denmark, of which 196 cases were subsequently transferred to the Eastern High Court ("High Court").  *Id*. ¶ 11.  From those cases, the parties and the High Court selected eight test cases to proceed before the High Court, while all other cases pending before the City Court are placed on hold until the High Court reaches a decision in the test cases.  *Id*. ¶ 12.  The Applicants CI Investments Inc., acting in its capacity as manager and trustee for and on behalf of First Asset Morningstar International Value Index ETF, and Lighthouse Investment Partners LLC are claimants whose actions are proceeding before the High Court as test cases.  *Id*.  On June 25, 2020, Danske submitted its Statement of Defense in the High Court, and the claimants replied on December 1, 2020.  *Id*. ¶ 15.  There have been several rounds of briefing regarding factual issues and the parties' legal positions.  *Id*.

Danish civil procedure does not have a separate evidence-gathering or "discovery stage," separated in time from a "pleading stage" and a "trial stage."  Noer Decl. ¶ 21.  Rather, Danish civil procedure is, like most civil law jurisdictions, a more continuous process whereby evidence-gathering and submitting proof to the court occurs throughout the life of the case, starting (preferably and frequently) before suit is brought (*i.e.* pre-action) and continuing through various stages of making proof, until final oral argument.  *Id.*  So far, the Danish Actions have been pending for more than five years.  *Id*. ¶ 23.  In accordance with Article 6 of the European Convention of Human Rights, one of the basic principles of due process requires that justice be done within a reasonable time.  *Id*.  Thus, the time to obtain and submit evidence in the Danish Actions is now. *Id*.

In fact, a rudimentary process of discovery of relevant documents in Danske's possession is underway. *Id*. ¶ 16. On November 23, 2022, the High Court ordered Danske to disclose many of the case-critical documents requested by the claimants for use in each of the continuing (*i.e.* non-stayed) cases. *Id*. On December 7, 2022, Danske sought permission to appeal the decision on discovery to the Supreme Court, which request was denied by Denmark's Appeals Board on March 16, 2023. *Id*.

In Denmark, compliance with discovery orders is not mandatory; the only sanction for non-compliance is the threat of adverse inferences, which are entirely within the Danish court's discretion. *Id*. Since the High Court's discovery order in November 2022, Danske informed the High Court and the claimants multiple times that it will not comply with the Danish court's order. *Id*. ¶ 24. On June 19, 2023, the claimants asked the High Court to set a quick deadline for Danske to produce the so-ordered discovery, and the court promptly ordered Danske to comply before the end of June 2023. *Id*. Danske failed to produce any documents by June 30, and the High Court set August 28, 2023 as the final deadline for Danske to comply with its discovery order. *Id*. Danske ended up producing only 118 documents in response to the claimants' 89 requests and claimed to no longer be able to find six documents, which are believed to be of key importance since they include updates on the AML scandal to the (now former) CEO. *Id*.

The documents that Danske did produce are heavily redacted even though the Eastern High Court in its November 23 Ruling only allowed for limited redaction (customer names, etc.). *Id*. On September 13, 2023, the court stated it would address at trial any adverse inferences to be drawn against Danske from the missing or improperly redacted documents. *Id*.

The discovery that the Applicants seek from Promontory here is critical in helping them prove Danske's wrongdoing and liability, and is relevant to all eight test cases selected by the High

Court in Denmark and the hundreds of other cases in the Danish Actions that are stayed for the duration of the test cases but will resume afterwards. *Id*. ¶ 20.

The central question in the Danish Actions is Danske's knowledge of its Estonian branch's illicit practices and its duty to investigate the activities of the branch when various red flags became known. *Id*. ¶ 14. Thus, the Applicants have a significant and legitimate interest in demonstrating the existence (and Danske's knowledge) of such red flags (*id*. ¶ 22), as identified by Promontory in its extensive factual investigation into Danske Estonia's Non-Resident Portfolio. What was known or knowable by it to Danske was likely uncovered by Promontory in its investigation, and found in the underlying factual information used in the report's composition. The contents of the documents and testimony that the Applicants seek in the United States thus support the Applicants' allegations in the Danish Actions that Danske had knowledge of the extensive and years-long money laundering activities at Danske Estonia, considered those issues material, and should have taken proper action based on this knowledge. *Id*.

The Applicants have immediate use for the discovery they seek here and intend to use the evidence promptly after it is obtained with this Court's assistance. *Id*. ¶ 23.

## III.    ARGUMENT

### A.    APPLICABLE STANDARDS

As a preliminary matter, Section 1782 applications are permissible, and typically granted, *ex parte*. *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*"; "[t]he respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3)") (citing *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 78 (2d Cir. 2012)); *see also* Opinion and Order, *In re Ex Parte Application of CI Investments Inc.*, No. 23-mc-00434-GHW-GS (S.D.N.Y.

13

Dec. 14, 2023), ECF No. 13 (Magistrate Judge Gary Stein granting Section 1782 application *ex parte* for use in the same Danish Actions, without prejudice to respondents' right to move to quash the subpoenas).[7]

The purpose of Section 1782 is to enable parties like the Applicants to obtain "federal-court assistance in gathering evidence for use in foreign tribunals." *Intel*, 542 U.S. at 247. Section 1782 authorizes the Court to grant discovery for use in a proceeding in a foreign or international tribunal if these mandatory requirements are met: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *In re Guo*, 965 F.3d 96, 102 (2d Cir. 2020).

Once the statutory requirements are met, as they are here, a district court "may grant discovery under § 1782 in its discretion." *Kiobel v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244 (2d Cir. 2018) (citation omitted). Courts must exercise this discretion in light of the "twin aims" of the statute: "providing efficient means of assistance to participants in international litigation . . . and encouraging foreign countries by example to provide similar means of assistance to our courts." *Id.*

Courts must also consider the discretionary factors outlined in *Intel*: whether (1) "the person from whom discovery is sought is a participant in the foreign proceeding" (in which case

---

[7] Courts in other circuits have also granted Section 1782 applications *ex parte*. *See, e.g., CFE Int'l LLC v. Denham Cap. Mgmt. LP,* No. 22-MC-91355-FDS, 2022 WL 19558086 (D. Mass. Oct. 17, 2022); *Optimal Invs. Servs. S.A. v. Berlamont,* 773 F.3d 456 (2d Cir. 2014); *Xie v. Lai,* No. 19-MC-80287-SVK, 2019 WL 7020340 (N.D. Cal. Dec. 20, 2019); *In re Ambercroft Trading Ltd.,* No. 18-MC-80074-KAW, 2018 WL 286744 (N.D. Cal. June 11, 2018); *In re Douglas Frederick,* No. 20-MC-965-RP, 2020 WL 13190169 (W.D. Tex. Oct. 2, 2020); *In re Patokh Chodiev & Int'l Min. Res. B.V.,* No. 18-MC-13 (EGS), 2021 WL 3270042 (D.D.C. Feb. 15, 2022).

the foreign tribunal has jurisdiction over the person and can itself order that person to produce evidence); (2) the nature of the foreign proceeding and tribunal, and if it is receptive to U.S. court assistance; (3) the request conceals an attempt to circumvent foreign proof-taking restrictions or other policies of the foreign country or the United States; and (4) the request is unduly intrusive or burdensome. *Intel*, 542 U.S. at 264-65.

The Application meets all statutory requirements, is directly in line with the twin aims of the statute, and all discretionary factors weigh decidedly in favor of granting the Application.

### B.    THE APPLICATION MEETS ALL STATUTORY REQUIREMENTS

All prerequisites for a Section 1782 request are met in this case. *First*, Promontory's offices are at 280 Park Ave. #11F, New York, NY 10017, and it therefore resides or can be found within this District. Cho Decl. ¶ 3. *Second*, the City Court of Copenhagen and the Eastern High Court of Denmark are both civil trial courts that are first-instance decisionmakers within the Danish legal system (Noer Decl. ¶ 2) and each therefore qualifies as a "tribunal" under Section 1782. *Intel*, 542 U.S. at 257-58 (tribunals include courts that are "first-instance decisionmaker[s]"). *Third*, the Applicants seek the requested discovery for use in the Danish Actions, which are civil damages actions pending before a foreign trial court. Noer Decl. ¶ 2. (Excerpts from a sample Statement of Claim in the Danish Actions are attached to the Noer Declaration as **Exhibit 2** with an English translation as **Exhibit 3**.) *Fourth*, the Applicants clearly qualify as "interested persons," as they are claimants in the Danish Actions bearing the burden of proof on the elements of securities fraud (Noer Decl. ¶¶ 9, 14), and thus have a significant and legitimate interest in seeking the probative evidence they seek here. Noer Decl. ¶ 23; *see also Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782").

### C.    THE DISCRETIONARY FACTORS WEIGH HEAVILY IN FAVOR OF GRANTING THE APPLICATION

#### 1.    Granting Discovery Promotes the Twin Aims of Section 1782

A district court's discretion must be guided by several factors—including, in particular, the twin aims of the statute: "promoting efficiency in international litigation and persuading other nations, by example, to do the same." *Euromepa S.A. v. R. Esmerian Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995); *see also Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95, 96 (2d Cir. 2009).  Taking into account these objectives, "[t]he availability of Section 1782 discovery . . . is quite broad and only has broadened through successive amendments over the years." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 134 (2d Cir. 2017) (citing *Intel*, 542 U.S. at 247-49 (recounting changes in various amendments)).  Indeed, these policies alone "should generally prompt district courts to provide some form of discovery assistance." *Id.*

Here, granting the requested discovery unquestionably promotes Congress' objectives. Granting discovery would be an efficient means of assisting the claimants, including the Applicants, in the Danish Actions in meeting their burden of proof.  All discovery sought here is relevant and narrowly tailored to the Applicants' probative needs in the Danish Actions. Specifically, the documents and testimony the Applicants wish to elicit from Promontory are already known to include evidence of Danske's actual or constructive knowledge of, and lack of action about, the long-lasting and far-ranging money laundering activities at Danske Estonia,[8] which is the exact same factual basis as the Applicants' allegations and complaints of Danske's wrongdoing and liability in the Danish Actions.  Noer Decl. ¶¶ 10, 14, 20, 22.  There is no other

---

[8]    *See* Danske's Portfolio Investigation Report, https://danskebank.com/-/media/danske-bank-com/file-cloud/2018/9/report-on-the-non-resident-portfolio-at-danske-banks-estonian-branch.pdf, at 48, 79 (last visited Sep. 13, 2024).

more efficient way for the Applicants to obtain this evidence from Promontory or Danske.  *Id.* ¶ 27.

Supporting the statute's second aim, the example set by the United States has led to a two-way street with Danish courts returning the favor.  *Id.* ¶ 32.  Just as Section 1782 applications ask U.S. courts for judicial assistance in foreign proceedings, U.S. courts are able to issue Letters Rogatory or Letters of Request to foreign courts (including Danish courts) asking for the foreign court's judicial assistance in U.S. litigation.[9]  Danish courts have been receptive to such requests. *Id.*  For instance, in *AllianzGlobal Investors GmbH v. Bank of America Corporation,* No.18-CV-10364-LGS-SDA, 2022 WL 2168916 (S.D.N.Y. June 16, 2022) and *Forsta AP-Fonden v. St. Jude Medical, Inc.*, No.12-CV-3070 (JNE/HB), 2015 WL 13687909 (D. Minn. June 24, 2015), U.S. courts were able to issue Letters of Request and Letters Rogatory to Denmark pursuant to the Hague Convention for the purpose of obtaining international judicial assistance by Danish courts. Indeed, Denmark's Ministry of Justice advised the Applicants' Danish counsel that "the Ministry has experience in dealing with requests from U.S. courts for the taking of evidence in Denmark under the [Hague] Convention.  When we receive requests under the Convention, we examine whether the conditions for proceeding with the taking of evidence are met.  If this is the case, the case file is forwarded to the relevant court, which carries out the actual taking of evidence, after which the Ministry sends the court record and the case file back to the transmitting body."  Noer Decl. ¶ 32.

Denmark and its courts also provide wide-ranging cooperation to the United States and its courts through other means, and the United States reciprocates such cooperation and assistance.

---

[9] The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555 ("Hague Convention").

For instance, on June 25, 2003, the United States and the European Union entered into a Mutual Legal Assistance Agreement (Noer Decl. **Ex. 17** ("U.S.-EU Agreement")) and subsequently on June 23, 2005, the United States and Denmark entered into a Mutual Legal Assistance Instrument (Noer Decl. **Ex. 18** ("U.S.-Denmark Instrument")), which incorporates provisions of the U.S.-EU Agreement. Noer Decl. ¶ 33. The U.S.-Denmark Instrument sets out conditions relating to the provision of mutual legal assistance in criminal matters between Denmark and the United States and requires Denmark to provide legal assistance to the United States, upon request, with respect to serious offenses punishable under both U.S. and Danish law. U.S.-Denmark Instrument §§ 1-6. Specifically, the U.S.-Denmark Instrument provides that "Denmark shall provide assistance under this Article with respect to offenses punishable by a penalty involving deprivation of liberty or a detention order of a maximum period of at least four years in the requesting State and at least two years in the requested State. *The United States of America shall provide assistance under this article with respect to money laundering* and terrorist activity punishable under the laws of both the requesting and requested States." *Id*. at Annex, Art. 1(4) (emphasis added). Further, this Instrument includes detailed provisions such as creating a mechanism for identifying bank accounts and transactions (*id*. at Annex, Art. 1); providing a mechanism for forming joint and investigative teams (*id*. at Annex, Art. 2); providing for the use of expedited communications (*id*. at Annex, Art. 4); and authorizing the provision of mutual legal assistance to certain administrative authorities (*id*. at Annex, Art. 5).

Additionally, in a 2014 case where U.S. authorities requested that Dutch citizens residing in Denmark be extradited for criminal prosecution in the United States (which request was granted and subsequently upheld), Denmark again provided judicial assistance to the United States. Noer Decl. ¶ 34 & **Ex. 19** (Case U.2014.3448V) (referring to the U.S.-Denmark Extradition Treaty of

June 22, 1972, and ruling that the Denmark Ministry of Justice's decisions on the extradition of

Dutch citizens residing in Denmark for criminal prosecution in the U.S. were legal).

In continuation of the *quid pro quo* cooperation and mutual provision of judicial assistance

already existing between the United States and Denmark, it is clearly appropriate to grant the

Application to perpetuate the reciprocity Congress hoped to achieve.

### 2.    The Evidence Sought from Promontory Is Beyond the Danish Courts' Jurisdictional Reach

The first of the discretionary *Intel* factors – whether the discovery sought is outside the

foreign tribunal's jurisdictional reach – also weighs strongly in the Applicants' favor.  As the

Supreme Court has held, "nonparticipants in the foreign proceeding may be outside the foreign

tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be

unobtainable absent § 1782(a) aid."  *Intel*, 542 U.S. at 264.  That is exactly the case here.  Because

Promontory is not a party or expected party to the Danish Actions and Danish courts do not

otherwise have jurisdiction over U.S. entities (Noer Decl. ¶ 27), this Application satisfies the first

*Intel* prong.  *See, e.g.*, *Gorsoan Ltd. v. Bullock*, 652 F. App'x 7, 9 (2d Cir. 2016) ("Indisputably,

[the Respondents] are not parties to the [foreign] proceedings, and so the first *Intel* factor weighs

in favor of discovery against them."); *In re Atvos Agroindus. Inv. S.A.*, 481 F. Supp. 3d 166, 174

(S.D.N.Y. 2020) (because "Respondents . . . are not parties . . . the first *Intel* factor weighs in favor

of granting the Application as to them").[10]

---

[10] *Accord In re Operacion y Supervision de Hoteles*, No. 14 Misc. 82 (PGG), 2015 WL 82007, at *6 (S.D.N.Y. Jan. 6, 2015) ("Because [respondent] is not a party to the [Foreign] Proceeding and the foreign tribunal lacks jurisdiction to compel his testimony, analysis of the first *Intel* factor suggests that the subpoena should be enforced."); *La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F. Supp. 3d 358, 362 (S.D.N.Y. 2014) (finding the first *Intel* factor weighs in favor of granting discovery because "[respondent] is not a participant in the UK proceeding"); *In re Sveaas*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008) ("[Respondent's] status as a non-party in the foreign actions weighs in favor of granting [the Applicant's 1782] application").

### 3.    The Applicants Seek Information Essential to Foreign Proceedings and Nothing Indicates the Foreign Tribunal Would Not Be Receptive to the U.S. Court's Assistance

The second *Intel* factor weighs "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of . . . the court . . . abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264; *see also In re OOO Promnefstroy,* No. M 19-99 (RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct. 15, 2009) (U.S. courts should consider how "a foreign legal system . . . might respond to § 1782 assistance from a United States court").[11]

Here, the discovery sought by the Applicants is for use in the Danish Actions which are pending proceedings before the Danish courts, both of which are civil trial courts hearing civil damages claims as first instance decisionmakers.  Noer Decl. ¶ 2.  In the Danish Actions, the Applicants and the other claimants seek compensation for combined losses amounting to around $1 billion in total caused by Danske's violations of its disclosure obligations to inform the market in a timely manner about the extensive money laundering activities in Danske Estonia and investigations into the branch's practices and its failure to implement and enforce necessary procedures for the prevention of money laundering.  *Id.* ¶¶ 8, 11, 13.  The Applicants intend to submit the requested evidence to the Danish courts in connection with the pending Danish Actions, as allowed under Danish civil procedure rules.  *Id.* ¶¶ 23, 25(2).  Because any evidence prospectively granted by this Court pursuant to the Application will be heard by Danish trial courts in order to determine Danske's liability and the requested evidence is particularly probative of a core issue in the Danish Actions – *i.e.* Danske's knowledge of the money laundering activities in

---

[11] *Abrogated on other grounds by In re Top Matrix Holdings Ltd.*, No. 18 Misc. 465 (ER), 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020).

Danske Estonia during the 2007-2015 period and regulatory criticism and investigations (*id.* ¶¶ 20, 22) – the second *Intel* factor favors granting the Application.

Further, there is no reason to believe Danish courts would not be receptive to such evidence. Noer Decl. ¶ 30. To find otherwise would require "authoritative proof that a foreign tribunal would reject evidence obtained with the aid of § 1782." *Mees v. Buiter*, 793 F.3d 291, 303 (2d Cir. 2015) (citation omitted). Such "authoritative proof" must be in the form of a "clear directive" from the foreign court that it "would *reject* evidence obtained with the aid of section 1782." *Euromepa S.A.*, 51 F.3d at 1100 (emphasis added).[12] There is no such authoritative proof here. It is neither illegal under Danish law nor against Danish public policy to obtain evidence in the United States for use in Danish proceedings. Noer Decl. ¶ 28 & **Ex. 14** (Kang/Sandberg, Kurators indhentning af information og bevis i udlandet, *Erhvervsjuridisk Tidsskrift* 2013, at 21).

It is well-documented that Danish courts, in fact, *welcome* U.S. courts' judicial assistance. This is evidenced by their regular requests for such assistance[13]; and U.S. district courts have also consistently noted the Danish courts' receptivity, finding this factor to weigh in favor of granting Section 1782 discovery. Cho Decl. ¶ 14 & **Ex. K** (*Haarslev Indus., A/S v. Hans-Henrik Nissen*, No. 18-09009-MC-W-ODS, slip. op., at 6-7 (W.D. Mo. May 22, 2018) (rejecting respondent's motion to quash a subpoena based, in part, on finding that the Danish court was receptive to U.S. federal court judicial assistance under the second *Intel* factor)) and **Ex. L** (*Cal. State Tchrs. Ret.*

---

[12] *See also In re Banco Santander (Brasil) S.A.,* No. 22-MC-00022 (ALC), 2022 WL 1546663, at *2 (S.D.N.Y. Apr. 6, 2022) (granting discovery where "there is no indication that the Civil Court of São Paulo would be unreceptive to the discovery requests"); *In re Shervin Pishevar*, 439 F. Supp. 3d 290, 304 (S.D.N.Y. 2020) (granting discovery absent authoritative proof that the English courts would reject the evidence obtained).

[13] *See* Noer Decl. ¶¶ 30-31 & **Ex. 15** (*In re Req. for Int'l Jud. Assist. from the Dist. Ct. of Kolding, Denmark – Matter of Mette Lohse Skou Jensen v. Dwight Ferguson*, No. DK-7000, No. 15-MC-73 (W.D.N.C. May 4, 2015) (Dkt. #2 (Applicant's Mem.)) and **Ex. 16** (*In re Ltr. of Req. for Int'l Jud. Assist. from the Dist. Ct. of Lyngby, Denmark,* No. 13 CV00919 919 (N.D. Ill. Feb. 5, 2013) (Dkt. # 1 (*Ex Parte* Pet. of the U.S. for an Appt. of Comm'er to Provide Assistance to Foreign Trib. Pursuant to 28 U.S.C. § 1782))).

*Sys. v. Novo Nordisk, Inc*., No. CV1916458FLWDEA, 2020 WL 6336199, at *19, n.11 (D.N.J.

Oct. 29, 2020) (finding second *Intel* factor weighs in favor of Section 1782 discovery because

Magistrate Judge "found that '[n]either party . . . presented any information that would indicate

that the Danish Court is not receptive to discovery obtained in the United States'").

 Thus, there is no doubt that the second *Intel* factor also favors granting the Application.

**  4. This Application Does Not Circumvent Danish Proof-Gathering Restrictions or Other Policies**

 The third *Intel* factor considers if the Application seeks to circumvent foreign proof-

gathering restrictions or other policies of Denmark or the United States. *Intel,* 542 U.S. at 265. It

asks, in essence, whether it is a good faith effort to access probative and highly relevant evidence

for use abroad. *See In re YS GM Marfin II LLC*, No. 20 MISC. 182 (PGG), 2022 WL 624291, at

*9-10 (S.D.N.Y. Mar. 2, 2022) (holding that "[i]n connection with the third <u>Intel</u> factor, courts

consider whether the application is brought in good faith" and, after analysis, finding "no evidence

of bad faith" and thus granting the applicants' motion); *see also Minatec Fin*. *S.A.R.L. v. SI Grp.*

*Inc*., No. 8-CV-269, 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008) (third *Intel* factor favors

discovery where nothing suggests information is sought with less than good faith belief that

discovery will be helpful); *In re Schottdorf*, No. 8-CV-269, 2006 WL 3844464, at *7 (S.D.N.Y.

Dec. 29, 2006) ("Absent any indication of bad faith," an attempt to acquire discovery that an

applicant is unable to obtain abroad is not "a vehicle to end-run foreign proof-gathering

restrictions").

 It is not bad faith to seek information in the United States that is not discoverable in the

country where the foreign case is pending. As the Second Circuit clarified in *Mees*:

> While we have instructed that "district judges may well find that in appropriate cases a
> determination of discoverability under the laws of the foreign jurisdiction is a useful tool
> in their exercise of discretion under section 1782," *Foden v. Gianoli Aldunate*, 3 F.3d 54,
> 60 (2d Cir. 1993), that observation does not "authorize denial of discovery pursuant to §

1782 solely because such discovery is unavailable in the foreign court, but simply . . . allow[s] consideration of foreign discoverability (along with many other factors) when it might otherwise be relevant to the § 1782 application.

*Mees*, 793 F.3d at 303 (quoting *In re Metallgesellschaft*, 121 F.3d 77, 79 (2d Cir. 1997)); *accord In re BNP Paribas Jersey Tr. Corp.*, No. 18-MC-00047, 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018). Nor does the third factor require that the Applicants show they have attempted to obtain the requested information from the foreign tribunal first. *See Mees*, 793 F.3d at 303 (holding that there is "no support in the plain language of the statute and runs counter to its express purposes" to impose such a "quasi-exhaustion requirement"); *accord In re Pishevar*, 439 F. Supp. 3d at 304; *In re Bloomfield Inv. Res. Corp.*, 315 F.R.D. 165, 167 (S.D.N.Y. 2016). Interested parties may also seek discovery pursuant to Section 1782 regardless of the status of the foreign proceedings. *In re Gorsoan Ltd.*, No. 13 Misc. 397 (PGG), 2014 WL 7232262, at *9 (S.D.N.Y. Dec. 10, 2014). There is no need to wait until the evidentiary stage of the foreign proceeding. *In re Servicio Pan Americano*, 354 F. Supp. 2d 269, 273 (S.D.N.Y. 2004).

Here, there is nothing to suggest that the requested discovery seeks to circumvent any Danish or U.S. policies or is otherwise in bad faith. The fact that a foreign tribunal has a more restrictive scope of discovery than that available in the United States, which is typically the case, is insufficient to demonstrate that the applicant is trying to circumvent foreign public policies. *See Mees*, 793 F.3d at 303 ("That a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means."). For an application to rise to the level of circumvention of proof-gathering restrictions, the foreign rules must be such as to "*prohibit* the acquisition or use of certain materials," not merely fail to facilitate investigation of claims through mandatory disclosures. *Id*. n.20 (emphasis original); *accord Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain

23

for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts."). There is clearly no such prohibition in Denmark against the requested discovery. Noer Decl. ¶ 25(3)-(4) (citing Sections 178, 298-300 of the Danish Administration of Justice Act ("AJA") which permit limited discovery) & **Ex. 8** (Section 178 AJA) and **Ex. 7** (Sections 298-300 AJA).

The use for which the Applicants seek to obtain discovery from Promontory is to support and prove their claims in the Danish Actions. The information they seek is in the hands of a party located in the United States (in this particular judicial district); is directly relevant to the Danish Actions; and is important to determine and apportion responsibility in the Danish Actions. Since Danish courts lack jurisdiction to compel Promontory to provide the requested information, it is completely understandable and justifiable the Applicants would seek to acquire it through other channels such as this Section 1782 Application. Because it clearly does not circumvent foreign proof-gathering restrictions or other policies of Denmark or the United States, the Application satisfies the third *Intel* prong.

### 5.    The Discovery Sought Is Narrowly Tailored to the Needs of the Danish Actions, and Is Neither Burdensome Nor Unduly Intrusive

The fourth and final *Intel* factor asks district courts to examine whether the applicant's discovery requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. In making this determination, courts must assess whether the requested discovery is "sufficiently tailored to the litigation issues for which production is sought." *In re Schottdorf*, 2006 WL 3844464, at *8. Even if the scope of discovery is found to be intrusive or burdensome, however, the court always retains

"broad authority . . . to fashion discovery orders issued pursuant to section 1782,"[14] and "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright."  *Mees*, 793 F.3d at 302 (internal quotation marks and citation omitted).

The present document requests and deposition topics are relevant and narrowly tailored to fall within the broad scope of federal discovery allowed in the United States.  *See* Cho Decl. **Exs. I** and **J** (Subpoenas with Schedule A's).  "The proper scope of the discovery sought under section 1782 . . . is governed by Federal Rule 26(b)," *In re Sveaas*, 249 F.R.D. at 106, and thus extends to all relevant evidence, *i.e.* "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Id.* (quoting *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978)).  The Applicants' discovery requests here are critical and closely tailored to the Applicants' evidentiary needs in all eight test cases that the High Court has selected to proceed, the outcomes of which will be of importance to the hundreds of other cases in the Danish Actions that remain stayed pending resolution of the test cases.  Noer Decl. ¶ 20.

**Request #1** seeks draft or final investigative reports prepared by Promontory on behalf of Danske concerning or related to Danske Estonia's non-resident customer accounts, or actual or potential instances of money laundering through Danske Estonia, including all footnotes and/or end notes.  **Request #2** seeks materials containing underlying factual information used in generating any draft or final investigative report concerning or related to Danske Estonia's non-resident customer accounts, or actual or potential instances of money laundering through Danske

---

[14] *In re Sveaas*, 249 F.R.D. at 106 (citing *In re Malev Hungarian Airlines,* 964 F.2d 97, 102 (2d Cir. 1992)) (internal quotation omitted).

Estonia, whether or not cited in the footnotes and/or end notes, but, for clarity, not any suspicious activity reports ("SARs") that Promontory may have reviewed.

These requests are neither burdensome nor unduly intrusive because the various drafts and final versions of Promontory's reports are readily available to it, and the materials relied upon were footnoted or referred to in, and/or attached to, those reports and presumably shared with Danske and various authorities through the course of its investigations; therefore, those documents are both easily discernable and accessible to the Respondent.  Furthermore, as a company in the business of providing consultancy and investigative services to financial entities, it must be presumed that Promontory has a system for organizing and filing the large volume of documents it regularly handles; thus it need only refer to its internal systems to identify and provide the requested documents.[15]  To the extent possible, the Applicants have sought to narrowly describe specific documents, the existence and content of which have been described in briefs, public documents or other materials discovered to date.

### D.    THE DISCOVERY SOUGHT BY APPLICANTS IS NOT PRIVILEGED

In anticipation of potential claims of privilege over the materials sought through this Application, for the following reasons Applicants affirm that the information they seek is not privileged.

### 1.    The Materials Sought Would Have Been Prepared Irrespective of Litigation

Generally, whether materials were prepared in anticipation of litigation is a crucial element in determining whether they enjoy protection under the work product doctrine. *United States v.*

---

[15] If the Court were to find the Requests unduly intrusive or burdensome, the Applicants respectfully ask the Court to use its discretion to "trim[]" the Requests, *Intel*, 542 U.S. at 265, or "issu[e] a closely tailored discovery order," *Mees*, 793 F.3d at 302, rather than reject them wholesale.

*Adlman*, 134 F.3d 1194, 1201 (2d Cir. 1998).  However, when a document is prepared for both litigation and business purposes, the dispositive inquiry is whether the material "would have been prepared irrespective of the expected litigation. . . ."  *Id.* at 1204.  Indeed, even where "[t]here is little doubt under the evidence that [a party] had the prospect of litigation in mind when it directed the preparation of the [document]" (*id.* at 1204), or that "such documents might [also] help in preparation for litigation" (*id*. at 1202), work product protection is not available for documents – such as the requested materials here – which "are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of litigation."  *Id.*

In *Allied Irish Banks*, the court found that the investigation (and subsequently generated report) being announced to the public demonstrated that there "were critical public accountability concerns that motivated the commissioning of the Report and, as a result, the creation of the underlying investigatory documents" which supported the conclusion that the report would have been prepared irrespective of litigation.  *Allied Irish Banks v. Bank of Am., N.A.,* 240 F.R.D. 96, 107 (S.D.N.Y. 2007).  Besides the publicly announced objectives, the court also found that the report was, in fact, used to "address[] culpability, accountability, control systems and organizational issues" and "fire individuals directly responsible for oversight" and "consistent with the findings and recommendations of the report" adopted a series of "organizational changes" to its "strategy and group structure" as well as to its corporate governance, which was evidence of the importance of the report/investigation as a corporate management tool, a purpose outside of litigation.  *Id*. at 108.

Here, Danske itself made precisely such a public announcement.  In its September 21, 2017 press release, Danske announced it was expanding its investigation into the Estonian branch, quoting former CEO Thomas Borgen:

It is essential for us that we get full insight into this matter and use that insight to prevent something similar from happening again. We will also report any other matters that our investigation may uncover to the relevant authorities.[16]

Thus, the investigations were motivated by business purposes beyond any anticipated litigation, and they were specifically not intended to remain confidential but were instead, from the outset, meant to be disclosed to multiple authorities. This perceived need to "get full insight" so that management may take steps to prevent future mistakes would have prompted the commissioning of Promontory irrespective of any litigation.

It is also clear that Promontory's fact-finding investigation was used to apportion personal responsibility and take disciplinary and other internal measures,[17] and that the CEO himself stepped down following Promontory's findings.[18]  Similarly, in *In re Kidder Peabody Securities Litigation*, Kidder Peabody ("Kidder"), a large financial institution, discovered that a rogue trader had caused it to suffer hundreds of millions of dollars in losses.  *In re Kidder Peabody Secs. Litig.*, 168 F.R.D. 459, 464 (S.D.N.Y. 1996).  Kidder engaged a law firm to represent it in expected litigation and also asked the firm to investigate the fraud and prepare a report.  *Id.* at 466.  Kidder ultimately released the report to the public.  *Id.* at 464.  In ordering the release of investigative materials used to generate that report, the court concluded that because Kidder was threatened not only with litigation but also with a "major business crisis," Kidder "would have hired outside

---

[16]    Danske Bank Press Release, https://danskebank.com/news-and-insights/news-archive/press-releases/2017/pr21092017 (last visited Sep. 13, 2024).

[17]    Danske's Portfolio Investigation Report, https://danskebank.com/-/media/danske-bank-com/file-cloud/2018/9/report-on-the-non-resident-portfolio-at-danske-banks-estonian-branch.pdf, at 19 (last visited Sep.13, 2024).

[18]    Danske Bank CEO quits over $234 billion money laundering scandal, https://www.reuters.com/article/world/danske-bank-ceo-quits-over-234-billion-money-laundering-scandal-idUSKCN1LZ0UM/ (last visited Sep. 13, 2024).

counsel to perform such an inquiry even if no litigation had been threatened at the time." *Id*. at 465.

Here, there can be no doubt that Promontory's fact-finding in part served Bruun & Hjejle's Accountability Investigation report, which was to "form a basis for decision-making in Danske Bank's Board of Directors" and to assess "potential institutional and individual accountability arising out of actions and omissions by individuals within Danske Bank who may have failed to identify, escalate or halt suspicious activities related to the Non-Resident Portfolio in Danske Bank's Estonian branch."[19]  Therefore, Promontory's investigation and subsequent report served important business objectives, such as the Danske Board of Directors' decision-making functions, including identifying those responsible for violating Danish securities laws, holding them accountable or taking other HR and business measures, including identifying and stopping the "suspicious activities" at Danske Estonia.

Accordingly, the materials from Promontory's fact-finding missions are not privileged.

### 2. The Work Product Doctrine Does Not Apply to Underlying Factual Information

In any event, the work-product doctrine does not immunize relevant underlying facts that are not the thought processes and analyses of attorneys made in the course of preparing for litigation. *Mitzner v. Sobol*, 136 F.R.D. 359, 362 (S.D.N.Y. 1991) ("[N]either the work-product rule nor attorney-client privilege protects against the disclosure of the underlying facts by those who communicated with the attorney").[20]  This is true even when underlying factual information

---

[19]    Danske's    Portfolio    Investigation    Report,    https://danskebank.com/-/media/danske-bank-com/file-cloud/2018/9/report-on-the-non-resident-portfolio-at-danske-banks-estonian-branch.pdf, at 19 (last visited Sep. 13, 2024).

[20] The attorney-client privilege does not come into play in connection with this Application because the Applicants are not requesting any communications between Promontory, on the one hand, and any lawyers associated with Danske Bank, on the other.

is embedded in an otherwise privileged document or report. *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC,* No. 01-CV-9291 (JSM), 2002 WL 1998195, at *3 (S.D.N.Y. Aug. 29, 2002) ("The work product privilege does not protect underlying facts from discovery merely because they have been incorporated into a privileged document.")

The investigation and report prepared by Promontory was based "on interviews with employees, including members of the Executive Board, and members of the Board of Directors, both current and former."[21] "49 individuals were interviewed, and a total of 74 interviews were conducted as part of the investigation" and Promontory was "given access to over 40 email accounts, in total containing more than eight million emails, documents, calendar invites etc." *Id*. This information is purely factual and therefore not protected by the work-product doctrine.

## IV.     CONCLUSION

For the foregoing reasons, the Applicants respectfully request that the Court grant the Application and enter an order, pursuant to 28 U.S.C. § 1782 and Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, giving the Applicants leave to serve the Subpoenas on Promontory.

---

[21] Danske's Portfolio Investigation Report, https://danskebank.com/-/media/danske-bank-com/file-cloud/2018/9/report-on-the-non-resident-portfolio-at-danske-banks-estonian-branch.pdf, at 20 (last visited Sep. 13, 2024).

Dated:    September 13, 2024
          New York, New York

                        Respectfully submitted,

                        By:    */s/ Olav A. Haazen*

                        **GRANT & EISENHOFER P.A.**
                        Olav A. Haazen (OH7788)
                        Alice Y. Cho (AC0728)
                        485 Lexington Ave., 29th Floor
                        New York, NY 10017
                        Tel: (646) 722-8500
                        ohaazen@gelaw.com
                        acho@gelaw.com

                        *Attorneys for the Applicants*